[No. 1537.]

## McGRUDER CHANDLER v. THE STATE.

1. PRACTICE—CONTINUANCE.—When, considered in the light of the testimony adduced on the trial, the probable truth of the absent testimony set up in an application for a continuance is not shown, the trial court cannot be said to have erred in refusing the continuance.

2. THEFT—CHARGE OF THE COURT.—The indictment being for theft, it was error to charge that the jury might, if warranted by the evidence, find the defendant guilty of receiving stolen property; but unless, in view of the evidence, such a charge operated to the prejudice of the defendant, the error is not cause for reversal when it was not excepted to, nor made a ground for a new trial, nor embraced in the assignment of errors. Note Presiding Judge White's qualification as to his position on this rule.

3. FACT CASE—EVIDENCE.—See evidence *held* sufficient to sustain a conviction for horse theft.

APPEAL from the District Court of Bastrop. Tried below before the Hon. L. W. Moore.

Appellant was, on the nineteenth day of October, A. D. 1883, in the District Court of Bastrop county, indicted for the theft of a horse, alleged to have been taken from the possession of one William Pollard, in Williamson county, Texas, on the fifteenth day of September, 1883. The penalty assessed by the jury was a term of five years in the penitentiary.

William Pollard was the first witness for the State. He testified, in substance, that his residence was in Williamson county, Texas. On the fifteenth day of September, 1883, he owned a dark bay stallion, about fourteen hands high, branded and counter-branded JF, connected, marked with an upper bit in the left ear, and having a white spot in the forehead and a white "snip" on the nose. About twelve o'clock on that day, the witness turned the animal into his home field; and about an hour later, he and his wife went to another field, about a mile distant, to pick cotton, leaving their two children, aged three and five, respectively, at the house, and returned about sundown. On the next morning, the witness sent his little boy to drive up the horse; and, after a time, the boy returned and reported that he could not find him. The witness then went himself, but failed

to find the animal  He found, however, his fence let down at
the back of his field, and the tracks of his horse, showing that·
he had been taken out at this point.  He found there, also, the
tracks of two persons, one about a number ten and the other
about a number seven boot or shoe.   There had been a light
rain that morning.   The tracks described had been made before
the rain, and cattle had passed along the trail on the outside of
the field after the rain, which disabled the witness from follow-
ing the tracks further.

Thick timber and brush grew on the inside of the field at the
point where the fence was let down, and the country from the
field to Mrs. Chandler's, in Bastrop county, is timbered and
brushy.   The distance from the witness's place, in Williamson
county, to Mrs. Chandler's, in Bastrop county, is about seventeen
miles.   The witness knew the defendant and one Tom Fagg.
Tom Fagg lived within a half mile of witness's house.   Witness
saw the defendant and Fagg on the Friday morning on which
he turned his horse into the field.   He saw them first, on that
morning, hauling cotton to the gin, and saw them again, about
ten o'clock· on the same day, as they returned from the gin.
Tom Fagg is a large man, and would wear about a number ten
·shoe.   The defendant is a small man, and wears, in the opinion
of the witness, about a number eight shoe.   Witness did not
think that the defendant and Fagg could see his, witness's, field
from the point in the road where the witness saw the said par-
ties.   The horse taken from the witness's field. was an exceed-
ingly gentle animal, and could easily be caught by any one.
Witness gave no one permission to take him.   Witness had
hunted the range unsuccessfully for this animal.   He made no
search for him, as he had no occasion to use him, until the morn-
ing after he turned him into the field.   Witness lived in a north-
erly direction from Mrs. Chandler's.

Henry Joiner, for the State, testified that he lived in Bastrop
county, about one mile distant from the residence of the defend-
ant's mother.   He had known the defendant about three years.
On the morning of Saturday, September 15, 1883, about nine or ·
ten o'clock, while out squirrel hunting, he saw a party riding a
gray and leading a bay horse.   He went in the direction taken
by the party, and soon came upon the defendant, hobbling the
bay horse.   The witness got within ten steps of the defendant
before he was observed by the defendant.   The defendant then
looked up somewhat excited, took the rope· from the horse's

neck, and asked if witness did not want to go to McDade with him. Witness declined, and the defendant mounted his horse and rode off in the direction of McDade. Witness went on a short distance, returned, and made a critical examination of the horse. He was a dark bay stallion, some fourteen or fourteen and a half hands high, with a small white spot in the forehead, white "snip" on the nose, saddle marked, branded and counter-branded JF, connected, and marked with an upper bit in the left ear. The animal was very gentle. The witness went up to and all around and about him. The place where the witness saw the defendant hobbling the horse was about three or four hundred yards from his, witness's, field, in the woods, about one mile from defendant's mother's place, about a half mile from the McDade road, and about five or six hundred yards from Coulson's tank, in Bastrop county. This was at a very dry season of the year, and the tank was used by a great many persons. The defendant was riding a gray horse. He hobbled the bay stallion with a grass rope hobble.

After the witness examined the horse he went home, thence to church, and told Mr. Hoskins, Mr. Parks and others of what he had seen, and described the horse to them. When the witness returned home from church, the horse was up near his field fence opposite where he had a horse staked inside his field. Witness went out about one o'clock to stake another horse, at which time the bay stallion was gone. There had been a light rain, and the witness took the horse's trail and followed it about one mile in a northerly direction, and into and along a road leading to the McDade wood yard, about two and a half miles west of the town of McDade. On that night, Saturday, September 15, 1883, witness, J. L. Fleming, Mr. Parks, Charles Hoskins and several others, numbering nine altogether, surrounded Mrs. Chandler's house. Some time after dark the defendant's brother Tom came out of the house with a Winchester rifle and a blowing horn. Witness and his party went with Tom Chandler as far as Coulson's tank, where all parties stopped. Some one of the crowd took Tom's horn and blew it continuously for some time. After having been at the tank about an hour, some one riding a dark colored horse and leading a light colored horse rode up from the direction of the wood yard to within forty or fifty yards of the party, and halted for a moment, and then turned and ran. The party pursued him, firing one or two shots. No capture of defendant was made at this time.

The night on which these occurrences took place was a moonlight night, but not so light that the party who rode up from the direction of the wood yard could be recognized. The witness, however, could readily distinguish that the horse ridden by defendant was dark of color. When he turned to run, he released the horse he was leading. The party then started on their return to Mrs. Chandler's house, within a quarter of a mile of which place they met and arrested the defendant and took him to McDade. At the time of his arrest the defendant was riding a dun colored horse. The witness at this time did not know William Pollard. He did not know the horse, nor did he know that William Pollard had lost a horse until about one week afterwards.

George Johnson testified, for the State, that he lived at the wood yard, about two and a half miles from the town of McDade, in Bastrop county. About sundown on the evening of Saturday, September 15, 1883, the witness saw a bay stallion, answering exactly to the description of the stolen animal, in the road, about a quarter of a mile south of the wood yard. He was hobbled with a grass rope hobble, and was traveling a road that crossed the railroad at the wood yard. He was coming from the direction of the defendant's mother's, and was going north.

Mrs. Fannie Johnson, the wife of the last witness, testified, for the State, that she lived at the wood yard with her husband. About sundown on Saturday, September 15, 1883, she saw a bay horse pass the wood yard traveling north. He was hobbled. About dark a man riding a light colored horse came by the wood yard and made inquiries for the hobbled horse. Witness told him that the horse had passed there. The person followed, and in about a half hour, a person passed back, going south, riding a dark colored and leading a light colored horse. It was dark when this person passed the wood yard, asking for the horse, and the witness could not say that he was or was not the defendant. Jim Davis was with the witness when the man passed, both following and returning with the horse.

H. R. Dinkins testified, for the State, that he lived about one mile from Tom Fagg, and about one mile from Pollard, in Williamson county. He saw the defendant and Tom Fagg together, at the latter's house, in Williamson county, on the fourteenth day of September, 1883. The State closed.

Mrs. Chandler, the mother of the defendant, was the first witness introduced in his behalf. She testified, in substance, that

on the Wednesday preceding Saturday, September 15, 1883, the defendant left her place in Bastrop county to go to Williamson county, to see his cousin, Tom Fagg. He and Tom Fagg re-turned to witness's house on the evening of Friday, September 14, 1883, about sundown. The defendant was then riding his gray horse, and Fagg was riding a dark colored horse. They had no other horse or horses with them. They remained at the house of the witness that night and until about ten o'clock next morning, when, riding the same horses, they left to go to Mc-Dade. They returned home from McDade about sundown on that evening. About half-past seven o'clock that night, the wit-ness's younger son Tom left her house to go to the Coulson tank to water his horse, and thence to go hunting. About an hour later the defendant, riding a brown mare and leading a gray horse, left the house to take the animals to water. He returned about ten o'clock and turned the brown mare out. Witness be-came uneasy about her son Tom, and directed the defendant to go and look for him. Defendant caught a dun horse and left, and did not return again that night. Tom Fagg was at the house of the witness on October 22, 1883. He was not then brought to Bastrop county by an officer, but came with witness and his uncle, William Scruggs, to go before the grand jury at the instance of the defendant; which he did.

Miss Lizzie Scruggs, a cousin of the defendant, testified in his behalf that she was at his, defendant's, mother's house on the night of Friday, September 14, 1883. Defendant and Tom Fagg came to the house about sundown on that evening, and were there next morning at nine o'clock, when witness left. They brought with them only the horses they were riding.

Miss Minnie Chandler, the defendant's sister, testified in his behalf that she saw him and Tom Fagg when they arrived at her mother's house on Friday evening, September 14, 1883. De-fendant was riding his gray, and Fagg a dark colored horse. Witness left home about nine o'clock next morning, and both defendant and Fagg were then there. Witness returned home that evening, and defendant and Fagg came to the house about sundown. After supper the witness's brother Tom left the house to go hunting. A short time later the defendant left to go to Coulson's tank, riding a brown mare and leading a gray horse. The defendant returned about ten o'clock, and turned out the brown mare. Witness's mother becoming uneasy about

her son Tom, she sent defendant on a dun horse to look for him.

Tom Chandler, the defendant's brother, testified in his behalf that on the night of defendant's arrest he started hunting with a gun and a horn, by way of the Coulson tank to water his horse. A short distance from the house he met Parks, Hoskins and others, who went with him to the tank. Hoskins took witness's horn and blew it. Witness denied that he told Parks and Hoskins that he was going to the back of Harry Coulson's field, to take the gun and a saddle to defendant.

William Curr testified, for the defense, that he saw the defendant in McDade about five o'clock on the evening of his arrest. He then said that he was going home, and walked toward his horse.

George Wilson testified, for the defendant, that on Saturday morning before the arrest of defendant, about eleven o'clock, witness passed Mrs. Chandler's house in company with Henderson Smith. He saw defendant and Fagg get on their horses and ride off toward McDade. They rode in front of witness and Smith for about a mile, when they struck a lope. Witness saw no more of either of them until he reached McDade, about one o'clock. He then saw defendant on Milton's gallery. From Mrs. Chandler's to McDade is about four miles. Henderson Smith's testimony was in substance the same.

In rebuttal, Mr. Parks testified, for the State, that he saw the witness Tom Chandler on the night of the arrest of the defendant. He told the witness and party that he was going to the back of Harry Coulson's field, to take a gun and saddle to the defendant. The party went with Tom as far as the tank, when Tom would go no further, and the party remained with him there, Hoskins blowing a horn until some one rode up within forty yards, and, after stopping a moment or two, ran. The party pursued and fired one or two shots at the man.

The testimony of Hoskins, for the State, in rebuttal, was substantially the same as that of Parks.

The application for continuance, the ruling upon which is the subject matter of the first head note, was based upon the absence of Tom Fagg, Jim Davis and Fannie Johnson. By Fagg the defendant proposed to prove that said Fagg was in the company of the defendant all day on the day of the alleged theft, and traveled with him from Williamson to Bastrop county, and that the stolen horse was at no time during that day in possession of

the defendant. By the witnesses Davis and Fannie Johnson, he proposed to prove substantially what he did prove on the trial by Fannie Johnson.

The motion for new trial assailed the action of the court in overruling the motion for new trial, and denounced the verdict as unsupported by the evidence.

*J. D. Sayers,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. 1. We cannot say that the court erred in overruling defendant's application for a continuance. It did not appear upon the trial that the facts set forth in said application, which the defendant stated he expected to prove by the absent witnesses, were probably true. Considering the evidence in the case, we think it quite improbable that such statements were true. (Code Crim. Proc., Art. 560.)

2. It was error for the court to charge the jury that they might, if the testimony warranted it, convict the defendant of the offense of receiving stolen property, he being indicted for theft. (*Brown* v. *The State,* this day decided, *ante,* p. 581.) This charge, however, was not excepted to, was not made a ground for a motion for new trial, and is not even embraced in the defendant's assignment of errors. In view of the evidence we do not think this erroneous charge injured the rights of the defendant. It is evident to our minds that the jury were not mislead thereby. There was not a particle of evidence proving that defendant received the horse from any person after the theft had been perpetrated, and the jury by their verdict found the defendant guilty as charged in the indictment, which charge was the theft of the horse. If the charge had been excepted to, of course it would have been fatal to the conviction. But, not having been excepted to, and not being fundamental error calculated to injure the rights of the defendant, and which in our opinion did not injure his rights, we shall decline to disturb the conviction on account of it.

3. We think the verdict of the jury is well supported by the evidence, and that the jury could not reasonably have arrived at any other conclusion than that the defendant committed the theft.

The judgment is affirmed.

White, Presiding Judge. I concur in the foregoing opinion; except that, if there had been evidence in the case warranting the charge of the court that the jury might convict the defendant of the offense of receiving stolen property under the indictment for theft, I should hold that such charge was not error.

*Affirmed.*